# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3917-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.P.,

     Defendant-Appellant,

and

K.O. and D.C.,

     Defendants.

_____

IN THE MATTER OF N.P.
and G.O., minors.

_____

Submitted May 5, 2021 – Decided June 29, 2021

Before Judges Ostrer, Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Warren County, Docket No. FN-21-0144-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Laura M. Kalik, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Alexandra N. Vadala, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

S.P. (Sue) appeals from the trial court's March 5, 2019 fact-finding order, in which the court found that Sue had physically abused her almost-three-year-old son, G.O. (Greg).[1]

The abuse followed a toileting accident. To administer a spanking, Sue grabbed Greg by the left arm and restrained him as he tried to break free. In so doing, she fractured the humerus, the bone between the elbow and the shoulder.

---

[1] We use initials and fictitious names for defendants and the children to protect their privacy and preserve the confidentiality of the proceedings. R. 1:38-3(d)(12).

A-3917-19

Thus, the court found that Sue caused the fracture by "other than accidental means" under N.J.S.A. 9:6-8.21(c)(1).

Sue contends on appeal that the court incorrectly assessed the proofs, committed evidentiary error, and improperly shifted the burden of persuasion. The Division of Child Protection and Permanency (DCPP) and Greg's Law Guardian oppose the appeal.

We affirm.

I.

The DCPP presented its case through its caseworker, three treating physicians, and an expert.

The worker testified that an emergency room (ER) nurse reported Greg's suspicious injury. When a detective and DCPP personnel followed up with Sue, she admitted that two days before the hospital visit, Greg (who was toilet-training) defecated on the floor. Sue told the worker that she spanked him twice. To do so, "[s]he put [her] arm around his shoulder and pulled him," "grabbing [him] between her legs"; however, she denied that she pulled his left arm to keep him in place. She admitted that Greg complained of discomfort afterwards. On the following day, when "her boyfriend told her that there was something wrong with the arm," she noticed that it "was still swollen." Icing the arm did not

3

resolve the problem, so she brought Greg to the hospital after another day passed.

When DCPP's attorney asked the caseworker to recount Sue's boyfriend's statement to the prosecutor's office about the boy's injury, defense counsel raised a hearsay objection, which the court sustained. Specifically, defense counsel contended that the hearsay was not a statement of a party opponent, because the boyfriend had been dismissed as a party. Furthermore, it was not a statement against interest. DCPP disputed the second point, highlighting that the boyfriend admitted that he did nothing to obtain medical care for Greg for two days. The court agreed that the statement was "a statement against interest," but sustained the objection because the boyfriend was no longer a party. The court ruled that the boyfriend's statements were admissible "only to show the Division's investigation, not for the truth of the matter asserted."

The medical testimony focused on the type and cause of the fracture Greg suffered. Dr. James Seger, an ER physician, saw Greg during his ER visit. He testified that, according to Sue, Greg first complained about arm pain the day before; however, she was unsure what caused the pain. After reviewing the X-rays he ordered, Dr. Seger thought Greg suffered "a little bit of a spiral fracture," but he asked the diagnostic radiologist on call to read the image, too. The

4

radiologist diagnosed it as "more of an oblique fracture, . . . which is just one less axis of force but still bad." The radiologist further opined that the injury occurred at least two days earlier. Concerned that someone might have abused Greg, Dr. Seger ordered a complete skeletal survey, which showed no injuries other than the broken humerus.

Dr. Alexandra Kondratyeva, a pediatric orthopedic surgeon, also reviewed Greg's X-rays. She concluded that he suffered a displaced "spiral fracture" of the humerus midway between the elbow and the shoulder. She said that a "spiral fracture" is "usually associated with a long spike," a characteristic visible on Greg's image. She explained that "a twisting mechanism" causes a spiral fracture, while "a bending type . . . mechanism" causes an oblique fracture. But the treatment would be the same in either case. Dr. Kondratyeva said that Greg received a Sarmiento brace and was expected to heal fully.

When the radiologist, Dr. Jay Riccardi, testified, he clarified that the "mildly displaced" fracture could have been "a spiral but [he] reserved on calling it that based on the views [he] saw." In any case, he stated that calling a fracture "spiral" or "oblique" "would not change how you would treat it or what you would think would cause it." He also testified that the force required to cause such a fracture would be "fairly severe," something like "a fall from a substantial

A-3917-19

height like off of . . . monkey bars or . . . the top of a play gym or an injury sustained by a much older sibling" (unlike Greg's brother, who was only two years older than Greg), but not "rolling off the couch and landing on your arm . . . ." He testified, too, that because Sue did not identify how Greg was injured, and because the injury occurred days before she brought Greg for treatment, he was concerned about possible abuse.

DCPP's expert in child-abuse pediatrics, Dr. Gladibel Medina, testified that after thoroughly reviewing the medical and DCPP records, including Sue's and the boyfriend's statements to investigators, she determined "within a reasonable degree of medical certainty" that Greg's injury was "a spiral fracture or an angulated fracture, also oblique in nature." Either type of injury would have been caused by "a twist rotational type" mechanism. Although Dr. Medina would typically attribute such an injury to "routine play," she determined that "no medical history . . . support[ed]" the play hypothesis.

Instead, she established that the disciplinary incident most likely caused Greg's injury. She stated, "[W]e have an event that could have caused the trauma, we have symptoms associated in a time [and] manner with that particular event." She described the correlation between incident and relevant symptoms (crying, swelling, and reduced mobility) in some detail, and she noted that Sue

and her boyfriend did not report any possible accidental causes. She posited that Sue tried to restrain Greg to spank him, Greg tried to wriggle away, and the resulting twisting motion fractured his arm. Dr. Medina recounted that Sue alleged that her boyfriend hit Greg on the arm, but clarified that "[a]n impact onto the arm is not going to create this fracture because this is a twisting of the bone."

Sue's expert, Dr. Jack Levenbrown, disagreed with Dr. Medina's characterization of the fracture and its cause. An expert in pediatrics, radiology, and pediatric radiology, Dr. Levenbrown testified that Greg's fracture was "an oblique fracture with a little spiral component maybe," and that "a violent twisting" motion could not cause an oblique fracture. He also testified that, in any case, oblique fractures in "mobile" three-year-olds "tend to be accidental far and away and not inflicted," and that the lack of additional fractures made an accidental cause more likely.

Dr. Levenbrown concluded that Greg's fracture "was an accidental injury" that could have come "from jumping on a bed and falling off," or "falling down steps," or "running, tripping." Greg's attempt to pull away from someone holding his hand might have produced "a partial dislocation at the elbow," but not the type of fracture he suffered.

7

A-3917-19

Sue testified as well. She asserted that she spanked Greg "briefly on the bottom," but did not "grab anything while [she] was doing that." She did not recall him "try[ing] to run away while [she] w[as] spanking him," but "he was crying." Although she noticed no issues when she put Greg and his brother to bed that night, Greg was "holding his arm" when she saw him the next morning. She soon "asked him what happened" and "he said he didn't know." Sue, who could see that one of his arms was swollen and painful to move, wrapped his arm with a bag of frozen vegetables "to see if the swelling would go down." But the next morning, the swelling was no better, so she took him to the hospital. Although she testified that her boyfriend had disciplined the children once or twice, she did not try to blame him for Greg's injury.

On cross-examination, DCPP's attorney elicited that, according to the hospital record, Sue brought Greg to the hospital in mid-afternoon, not in the morning. The attorney also confronted Sue with her prior statements that she had grabbed Greg by the shoulders and put her arm around him. Sue responded that she did not remember grabbing him.

The Law Guardian confronted Sue with the boyfriend's statements to the prosecutor's office that Greg said his arm hurt two days before the ER visit; that Greg screamed when the boyfriend tried to move it; that they then iced the arm;

8

and that on Saturday, the boyfriend noticed Greg "coming down the stairs using the other arm." Defense counsel did not object.

The judge then questioned Sue directly. Sue explained that after she learned that Greg had defecated on the floor, she asked him why, and all he said was "because." She told him that "[y]ou've got to get a pow" — that is, a spanking — "for that." Then, "he just walked very slowly" to her, "sideways kind of like." He "came right in front of [her] and . . . he was in between [her] legs and [she] popped him twice," and he cried. She denied that he struggled or that she had to "tussle with him . . . to get him to stay still."

In her written opinion, the judge found that DCPP had proved, by a preponderance of the evidence, that Sue abused Greg "within the meaning of N.J.S.A. 9:6-8.21(c)(1)," which states that a parent abuses a child when she "inflicts or allows to be inflicted upon [a] child physical injury by other than accidental means which causes or creates a substantial risk of . . . protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ."

The judge cited inconsistencies in Sue's testimony. Sue testified that Greg "willingly submitted to her spanking and stood in front of her," and that "she did not grab him." But "during her interviews on September 2, 2018, [Sue] admitted

she put her arm around his shoulder and pulled him by his shoulders and held him between her legs." Sue also testified "that after she 'popped' [Greg] twice he did not cry," but in interviews after the ER visit, she reported that [Greg] "whined and cried."[2] Sue "testified that [her boyfriend] did not hit [Greg] on August 31," but reported, "during her post-incident interviews, . . . that [he] gave [Greg] a 'pop.'"[3] And although Sue "reported she brought [Greg] to the hospital early Sunday," "[h]ospital records show [Greg] was admitted . . . at 3:13 p.m."

The judge also contrasted Sue's version of events with her boyfriend's. Sue "testified that she did not notice any injury to [Greg's] arm on Friday"; however, her boyfriend "reported that on Friday, August 31, he heard [Greg] say he hurt his arm"; he "inspected" Greg's arm, "observed swelling," and attempted

---

[2] The judge mischaracterized Sue's testimony about Greg's crying. We discuss the oversight below.

[3] Sue's statement to the prosecutor's office may also have been inconsistent with her statement to a DCPP worker, even though she made both statements on the same day. According to the investigation summary, she told the prosecutor's office "that [Greg] 'pooped' on the floor on Friday and she sent him upstairs to his room with no toys . . . . [Her boyfriend] gave [Greg] a 'pop' (smack) . . . ." However, she told a DCPP worker, who "asked her if [her boyfriend] spanked [Greg] that night," "that she did not know." Because Greg was not with the boyfriend on the evening of the interview, it seems likely that "that night" referred to the night of the disciplinary incident. But there may be no inconsistency; neither statement is clear in its chronology and the investigation summary may have mischaracterized Sue's statements.

to move the arm, prompting a scream. The boyfriend further "reported that both he and [Sue] iced [Greg's] arm and told him not to move it." Sue "testified that on Saturday, other than the swelling to his arm, [Greg] was his 'normal self'" — but according to the boyfriend, Greg "did not run down the stairs as usual. Instead he came down the stairs using the other arm."

The court acknowledged that although it admitted the DCPP documentary record into evidence, it excluded all embedded hearsay not subject to a hearsay exception. However, the court concluded that the boyfriend's statements were subject to a hearsay exception: they "qualif[ied] as a statement against interest under N.J.R.E. 803(c)(25) because they show he had actual knowledge of [Greg's] injury on Friday, August 31, 2018, thus exposing him to allegations of possible medical neglect."

Based on the inconsistencies between Sue's testimony and statements, the judge found Sue's testimony "incredible." Finding the defense expert's testimony only partially credible, the judge disregarded "his conclusions about the infliction of physical abuse" (or lack thereof) because neither Sue nor her boyfriend reported a possible accidental cause.

By contrast, the judge found the treating radiologist — who had testified that only "fairly severe" force could cause a fracture like Greg's — "highly

11

credible." And she found that DCPP expert Dr. Medina presented "more convincing and believable" "testimony regarding the cause of" the fracture than did the defense expert. She stated that Dr. Medina "was articulate, gave detailed testimony, and provided straight and reasonable explanations," and "impressed" the court "with her intellect and experience in the field of child abuse pediatrics." She further noted that Medina "took a methodical approach to her investigation," "pinpoint[ing] the last time [Greg] was reported to be 'okay'" and "investigat[ing] what unusual circumstances may have occurred at the time of the injury that contributed to the fracture."

Thus, the court found:

> [T]hat on Friday, August 31, 2018, [Sue] decided to punish [Greg] after he defecated on the bathroom floor. She told [Greg] that as a result of his toileting accident he was going to get a "pow-pow", which he knew was a spanking. [Sue] deliberately pulled or grabbed [Greg's] arm towards her so she could hit him. [Greg] did not willingly submit to [Sue], which is why she positioned him between her legs so she could hit him. If [Greg] willingly submitted to the "pow-pow," as [Sue] alleged, there would have been no need to secure him between her legs to hold him in place; she could have "swatted" him as he stood in front of her. The amount of force she used to pull him towards her was "fairly severe" and excessive. It was that forceful pulling or grabbing of his left arm, combined with [Greg] twisting his arm to evade punishment from [Sue], that likely caused the fracture to his left arm. The court finds [Sue] did not intend to fracture [Greg's]

A-3917-19

arm; that injury was incident to the intended corporal punishment. The physical injury to [Greg's] arm was immediate. On Friday, [Greg] reported his left arm hurt and it was observed to be swollen and tender. [Sue] did not take [Greg] to the hospital for medical attention until Sunday, September 2, 2018 at 3:13 p.m.

The judge expressly declined to assign Sue the burden to prove that she did not abuse Greg, because "it was at least possible that [Greg] could have sustained the injury . . . from a fall or some other accident." Instead, the court found that DCPP proved that Sue "deliberately" "pulled or grabbed" Greg with force "sufficient to fracture his arm, especially because he was rotating it to wiggle away from her," and that Sue "should have foreseen that such action, because of the manner in which she pulled [Greg's] arm and the amount of excessive force she used, was likely to result in injury." Therefore, Sue's "conduct constitutes physical abuse within the meaning of N.J.S.A. 9:6-8:21(c)(1)."

On appeal, Sue raises two primary arguments:

POINT I

> THE TRIAL COURT'S DECISION MUST BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A FINDING THAT [GREG] WAS AN ABUSED AND NEGLECTED CHILD.

13

POINT II

THE TRIAL COURT IMPROPERLY SHIFTED THE
BURDEN OF PROOF TO [SUE], REQUIRING HER
TO PROVE HER NON-CULPABILITY, AND
DEPRIVING HER OF DUE PROCESS.

II.

We first reject Sue's contention that the trial court erred when it credited the Division expert's testimony while treating the defense expert's with skepticism. In this regard, Sue is asking us to retry the case. We decline the invitation. Rather, we must defer to a trial court's fact-findings, especially those of the Family court, N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 553 (2014), as long as "adequate, substantial and credible evidence" supports those findings, State v. Andrews, 243 N.J. 447, 481 n.5 (2020) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)), cert. denied, 593 U.S. ___ (2021), and we "generally defer to a trial court's credibility findings about the testimony of expert witnesses," State v. J.L.G., 234 N.J. 265, 301 (2018).

Here, the trial judge carefully explained her "credibility findings about the testimony of expert witnesses." She pointed out those specific parts of the testimony that she accepted or rejected; she also explained why she accepted or rejected them. Her conclusions are reasonable, and we shall not disturb them.

14

We acknowledge that the trial judge mischaracterized one minor aspect of Sue's testimony. Contrary to the court's finding, Sue admitted at trial that Greg cried after she spanked him; therefore, that testimony was not inconsistent with Sue's prior statement. Despite this minor mistake, ample evidence supported the court's decision, including the testimony of the radiologist and the DCPP expert, both of whom the court credited, and the other contradictions in Sue's testimony.

The court also did not err in determining that the boyfriend's statements were admissible as statements against interest. We defer to the court's evidentiary ruling absent an abuse of discretion, that is, a "clear error of judgement" or a decision "so wide off the mark that a manifest denial of justice resulted." Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (first quoting State v. Brown, 170 N.J. 138, 147 (2001); and then quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). A statement against interest is admissible if that statement "was . . . so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability . . . that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true." N.J.R.E. 803(c)(25). The judge found that the boyfriend's statements fell under that exception "because they show he had actual knowledge of [Greg's] injury on

15

Friday, August 31, 2018, thus exposing him to allegations of possible medical neglect since [Greg] did not receive medical attention until two days later."

At the same time, we acknowledge that the trial judge reconsidered her earlier evidentiary ruling without notice to defense counsel. The court should have provided notice. See Lombardi v. Masso, 207 N.J. 517, 537 (2011) (stating that "where a judge is inclined to revisit a prior interlocutory order, what is critical is that he [or she] provide the parties a fair opportunity to be heard on the subject"). However, Sue has not demonstrated how she was prejudiced by the lack of notice, as opposed to the evidentiary ruling itself, which we conclude — after considering Sue's contentions — was not erroneous.[4]

We also discern no merit in Sue's argument that the trial court improperly shifted the burden of persuasion to her. The trial court explicitly declined to shift the burden of proof. Instead, it held DCPP to the burden of proving by a preponderance of the evidence that Sue abused Greg.

Finally, we address Sue's contention that the trial court erred when it determined that she abused Greg within the meaning of Title Nine. The judge relied on N.J.S.A. 9:8-8.21(c)(1), which forbids a parent to "inflict[] . . . upon

---

[4] For example, she does not explain how she would have conducted her defense differently had the court informed her, at the start of trial, that the boyfriend's statements would be admitted as statements against interest.

[a] child physical injury by other than accidental means which causes or creates a substantial risk of . . . protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ." Even if a parent does not intend to cause an injury, if that parent engages in a "deliberate" action and "can or should foresee that [her] conduct is likely to result in injury," then "that injury is caused by 'other than accidental means.'" G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 175 (1999). Reviewing the court's legal conclusions de novo, N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. at 552, we are convinced that the court did not err in applying the statute. There was no evidence that Sue intended to break her son's arm. However — as the court stated, based on adequate, substantial, credible evidence — "[t]he amount of force she used to pull him towards her was 'fairly severe' and excessive." Consequently, the court appropriately found that Sue should have foreseen that extreme force would likely result in injury, which it did in this case.

To the extent not addressed, Sue's remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3917-19